Steven Jeremy Freeman, Plaintiff, *pro se*
SID#: 14561263
Oregon State Penitentiary
2605 State Street
Salem, OR 97310

FILED11 AUG '22 11:22USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| STEVEN JEREMY FREEMAN, | ) | |
| | ) | Civil Action No. 2:20-cv-00602-CL |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | PLAINTIFF'S OBJECTIONS |
| | ) | TO DEFENDANT'S MOTION |
| SCHWARTZ, ET AL, | ) | FOR SUMMARY JUDGMENT |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ ) | | |

**CERTIFICATE OF CONFERRAL**

Plaintiff certifies that Plaintiff is an Oregon Department of Corrections (ODOC) adult in

custody (AIC) and is not represented by counsel.

1.

As a preliminary matter, before responding directly to Defendants' Motion for Summary

Judgment, Plaintiff asks that this Court take into consideration that Plaintiff is a *pro se* litigant

not trained in the law, who is relying on the assistance of a legal assistant employed by the Law

Library of the Oregon State Penitentiary (OSP), who is himself not well-versed in federal law,

but is learning as he goes along, and is frankly overwhelmed with the requirements of study and

drafting a response to this Motion for Summary Judgment. As the 9th Circuit Court of Appeals

has held, in *Gillespie v. Civiletti*, 629 F.2d 637 (1980):

> In considering a motion to dismiss, the general rule is that a complaint should
> not be dismissed on the pleadings "unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957); *California ex rel. Younger v. Mead*, 618 F.2d 618, 620 (9th Cir.1980); *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 429 (9th Cir.1978). In evaluating a complaint, any doubts should be construed in favor of the pleader. *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 834-835 (9th Cir.1980); *Amfac Mortgage Corp.*, 583 F.2d at 430.

   While the above-stated general rules apply equally as well to civil rights complaints brought by pro se plaintiffs, such pleadings are held to a less stringent standard than formal pleadings drafted by lawyers. See, *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972). Such plaintiffs should be given "an opportunity to amend (their) complaint(s) to overcome any deficiency unless 'it clearly appears . . . that the deficiency cannot be overcome by amendment.' " *Stanger v. City of Santa Cruz*, slip op. 2470 (9th Cir. March 24, 1980), citing *Potter v. McCall*, 433 F.2d 1087, 1088 (9th Cir.1970).

Even though in the current case it's a Motion for Summary Judgment rather than a Motion to Dismiss, Plaintiff respectfully asks that this Court allow Plaintiff the same consideration, and should the Court find that there are deficiencies in his Complaint and any subsequent submissions to the Court, please order that Plaintiff be given leave to amend his Complaint consistent with the Court's findings.

## RESPONSE TO DEFENDANTS' MOTION

   Plaintiff disputes Defendants' characterization of Plaintiff's Claim III as "(3) claims related to a hunger strike plaintiff undertook..." (Defendants' Motion For Summary Judgment (hereinafter referred to as "Motion,") page 1.) Plaintiff did not at any time undertake a hunger strike. Plaintiff was denied access to food by ODOC staff when ODOC staff refused to allow him to have a wheelchair to facilitate his going to where the food would have otherwise been served to him. At no time did Plaintiff refuse to eat, or refuse to go to where the food would have otherwise been served to him. Plaintiff was unable to walk to where the food would otherwise been served to him, ODOC staff refused to allow him a wheelchair, and ODOC staff refused to have food delivered to him.

Defendants characterize the statements made in the Motion as "undisputed facts" (Motion, page 2). However, as will be made clear *infra*, the statements made by Defendants are in fact disputed by Plaintiff, and Plaintiff does not accept those statements as fact.

## MEMORANDUM OF LAW

### I.    Legal Standard.

Fed. R. Civ. P. 56(a): "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c): "(1) * * * A party asserting that a fact * * * is genuinely disputed must support the assertion by:

"(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

"(B) showing that the materials cited do * * * establish the * * * presence of a genuine dispute * * *."

In their MEMORANDUM OF LAW included in their Motion Defendants purport to quote Fed. R. Civ. P. 56(e)(2) as saying that the non-moving party must "set out specific facts showing a genuine issue for trial." However, what Fed. R. Civ. P. 56(e)(2) actually says is: "consider the fact undisputed for purposes of the motion;" with regard to what the Court may do, "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c) * * *" (Fed. R. Civ. P. 56(e).) This simple fact alone, that the Defendants misrepresent to this Court what is the legal standard the Court is required to follow, is sufficient cause for this Court to deny Defendants' Motion.

## II.    Legal Argument.

### A.    Defendants are not entitled to summary judgment against Claim I.

#### 1.    Background Facts.

Defendants allege in their Motion that, "In his complaint, plaintiff does not allege that he made a timely request for Orthodox Jewish Passover meals to either Chaplain Hodney or Mr. Young." This is patently not true. In his Complaint, in Claim I, page 2, Plaintiff clearly states, "Upon my return to T.R.C.I. I spoke with Chaplin [sic] Don Hodney, my chaplin [sic] for meny [sic] years at T.R.C.I. told him what I had to deal with at E.O.C.I. and he told me he would put me on the list for my Passover meal, as he has done for many years." This is an unambiguous statement that Plaintiff made a request to Chaplain Hodney for a Passover meal, and it must have been timely, since Chaplain Hodney attempted to comply with the request.

On the same page of his Complaint, Plaintiff goes on to explain, "When Passover came, it turned out that O.D.O.C. in Salem did not put me on the Passover meal because 'Chaplin' [sic] L. Schwarz e-mailed O.D.O.C. in Salem, told them that I would not take the non-kosher 'veggie tray' w/matzo for my week of Passover meals. So I shoud [sic] not get any meal.

"Response from a Stuart Young from the O.D.O.C. Religious Services stated I'm not really a Jew."

The timely request made to Chaplain Hodney had been forwarded to O.D.O.C. Headquarters where it was denied by Mr. Young. The request was made directly to Chaplain Hodney, who is personally responsible within his authority as a Chaplain employed by the O.D.O.C. to respond to the legitimate requests of the A.I.C.'s under his authority. That request was forwarded to Mr. Young, who is responsible as the Assistance Director of O.D.O.C. whose duties include administering all religious activities of A.I.C.'s within the O.D.O.C., for overseeing Chaplain Hodney, to insure that Chaplain Hodney is faithfully fulfilling the duties of

his office as Chaplain.

Defendants attempt to divert attention away from Mr. Young's personal responsibility by focusing on his having responded to one of Plaintiff's grievances. (Motion, Page 5.) However, Plaintiff does not name Mr. Young as a Defendant because of his response to a grievance. Plaintiff names Mr. Young as a Defendant due to his direct involvement in the decision-making process of denying Plaintiff a kosher meal for Passover, through taking the responsibility of responding to the request that came to him from Chaplain Hodney, being the ultimate decision-making authority in denying Plaintiff the kosher meal. It was Mr. Young who made the decision to deny Plaintiff the kosher meal. Making that decision is how Mr. Young incurred liability for Plaintiff being denied his Constitutional right to freely practice his religion.

### 2.    Defendants' Legal Arguments Are Not On Point

Defendants rely on the four-pronged standard established in *Turner v. Safley*, 482 U.S. 78 (1987) to assert that Defendants did not violate Plaintiff's First Amendment right to freedom of religion. Their analysis fails for the following reasons.

Prong one of the *Turner* standard is that there must be a rational connection between any restriction on religious freedom and the government interest used to justify it. Defendants reason that the O.D.O.C.'s policy of a sign-up deadline for the Passover celebration can be justified. However, Plaintiff has not raised any claim against the O.D.O.C.'s policy. Plaintiff's claim is that persons acted to deny him his Constitutional right to freely practice his religion. Nowhere in his Complaint has he made any claim against the O.D.O.C. policy of establishing a deadline date for signing up to participate in the Passover celebration.

The second prong of the *Turner* standard is whether or not alternative avenues for exercising his Constitutional right are available other than the way he attempted to exercise it that was denied by Defendants. In their Motion Defendants state, "Here, plaintiff could have

received an Orthodox Jewish Passover tray by timely signing up for it." (Motion, Page 6.) It makes no sense to state this as an *alternative* to what was denied to Plaintiff by Defendants. This is exactly what *was* denied to Plaintiff by Defendants. Plaintiff claims he signed up in a timely manner. Defendants claim he did not. The *alternative* he was offered was a vegetable tray that *is not* kosher, even with matzo added to it. A non-kosher meal *is not* an alternative that an observant Jew may avail himself of and remain within the boundaries of his faith. Finally, Defendants point out that Plaintiff participated in the Seder plate observance. However, this is not an *alternative* to anything. The Seder plate is *in addition to* any other part of the Passover celebration, not an *alternative* to anything.

Third in the *Turner* criteria is the question of whether the accommodation for Plaintiff's religious observance would have an adverse affect on prison staff, prisoners, or O.D.O.C. resources. Defendants assert that, "ODOC's orderly operations would be compromised if it were forced to accommodate plaintiff for 2019 Orthodox Jewish Passover accommodations after the signup deadline..." (Motion, Page 7.) However, Plaintiff did not ask to be accommodated *after* the sign-up deadline. Plaintiff claims that his request was made well before the sign-up deadline. It was Defendants who failed to see to it that he was on the list to receive the kosher meal for the Passover celebration. It was their failure to respond in a timely manner that left them attempting to compensate for their own failure by claiming that Plaintiff had not signed up within the specified time limit.

The fourth and final criterion under *Turner* is whether or not there is a ready alternative to the *rule* in question. As stated *supra*, there is no rule in question. Plaintiff is not challenging the rule. Plaintiff is challenging the actions of persons.

Defendants' reliance on the *Turner* standard to defend against Plaintiff's claim that Defendants violated his Constitutional right to freely practice his religion fails on every element

of the standard.

Defendants argue that they did not violate Plaintiff's right to equal protection under the law under the Fourteenth Amendment to the US Constitution because the sign-up deadline for participating in the Passover celebration is not discriminatory. As explained *supra*, Plaintiff is not claiming anything about the sign-up deadline, other than to assert that he met the deadline. The basis for Plaintiff's Fourteenth Amendment claim is that Chaplain Schwarz discriminated against him because of her prejudice against Jews in denying him participation in the Passover celebration. As Plaintiff states in his Complaint, "A Chaplin[sic] L. Schwarz came to the infirmary where I was. I first asked her about any Jewish services they have at E.O.C.I. She informed me E.O.C.I. dose[sic] not have 'Jew services' or care. I then told her that I need to be placed on the Kosher Passover meals. I was then informed that 'They don't do Jew meal', and if I want Passover meal I can just eat a 'veggie tray', with 'matzo' to make it 'Jew enough for Passover.' When I told her that 'veggie' trays are not even Kosher, & no wear[sic] Kosher for Passover, she got mad at me and told me I can have nothing at all." (Page 1 of Complaint at IV. Statement of Claim, Claim #I.) This Claim mentions nothing about any fault in the O.D.O.C. Policy regarding a sign-up deadline for Passover. The Claim is about the actions of Chaplain Schwarz. (See Exhibit B – Inmate Communication Form addressed to Michael Gower, O.D.O.C. Assistant Director,

### 3.    Defendants Are Not Entitled To Qualified Immunity.

Defendants state in their Motion, Page 9, that, "Here, even if a violation occurred, a reasonable prison official would have believed that the procedures employed in this case, **all in accordance with ODOC policy**, were lawful." [Bold added for emphasis.] However, Plaintiff claims that Chaplain Schwarz's actions *were not* in accordance with O.D.O.C. policy. On the contrary, Chaplain Schwarz acted to circumvent O.D.O.C. policy by not only denying Plaintiff

the ability to participate in the Passover celebration by misrepresenting that he had not signed up in a timely fashion, but contacted Mr. Young via e-mail at O.D.O.C. headquarters to fraudulently claim to Mr. Young that Plaintiff was not qualified to participate in the Passover celebration at all, something she knew to be false. (See Exhibit A – Inmate Communication Form dated 4-19-19, identified in discovery by Defendants as FREE 0073-0078.) As Defendants state in their Motion, one of the criteria for determining whether an official is entitled to qualified immunity is, "Under the law, could a reasonable officer have believed the conduct was lawful?" (Motion, Page 8.) No reasonable person could believe that lying is lawful conduct.

### B.    Defendants are not entitled to summary judgment against Claim II.

#### 1.    Background Facts.

As Plaintiff states in his Complaint, Page 3: "June 21, 2019 I was went to Kadlec Hospital in the State of Washinton[sic] for painful spinal surgery. After I was in the recovery room then at or about 1400, c/o Washburn came in to relive[sic] the other staff. At this time he pulls out of his 'belly chins'[sic] and 'handcuffs' that wear[sic] obviously and visible the wrong size for a person of my size as they wear[sic] made for a small child. As c/o Washburn did not care, and made jokes on how fat & dumb I was, & he would just 'make them fit'. The wrist cuffs cut me as he forced them on to my wrists, and I bleed. But he refused to get the right size, or do anything.

"Over the two days at Kadlec Hospita[l] my wrists bleed. The nurses tryed[sic] to put 'gauze' under the cuffs to stop the bleeding. But staff would not remove them, or cared about the pain I was in.

"Until Sgt. Simson, & c/o Martin the staff that would take me back to T.R.C.I. and staff that have some honor, Sgt. Simson removed the cuffs. The nurses put banges[sic] on my wrists to stop the bleeding and Sgt. Simson, used a 'zip tie.'"

2.    **Legal Argument.**

a.    **Defendants Not Under Sovereign Immunity.**

In their Motion, Page 10, Defendants assert that, "Plaintiff's Intentional Infliction of Emotional Distress claim against Lieutenant Washburn arises under state law." However, Plaintiff clearly states in his Complaint, Page 2, "This is a civil rights action filed by Steven Jeremy Freeman, a state prisoner for damages and injunctive relief under 42 U.S.C. § 1983 alleging excessive force, intentional infliction of emotional distress, the Eighth Amendment cruel and unusual punishment, excessive force." There is no claim under any state law. Counsel for Defendants, experienced in law, may interpret the term "intentional infliction of emotional distress" as a state law tort, but Plaintiff has no legal education whatever, and has no intention of making any sort of state law claim. Plaintiff's intention is that his claims be evaluated in terms of the rights afforded to him under the Constitution of the United States of America, and no other authority is invoked for his claims. Plaintiff is aware of no law that entitles Lieutenant Washburn to sovereign immunity from insuring in his official capacity as an employee of the O.D.O.C. that his actions do not infringe on the Constitutional rights of the prisoners it is his responsibility to supervise.

b.    **Defendant Violated Eighth Amendment.**

Defendant Washburn's defense depends upon the statement in the Motion, Page 11, "Here, Lieutenant Washburn's application of full restraints to plaintiff during his transport was appropriate because it complied with prison regulations that were adopted for the purpose of public safety." However, Plaintiff's claim against Defendant Washburn is not that it was inappropriate to apply full restraints. Plaintiff's claim is that it was unnecessary to apply restraints that were so tight that they caused Plaintiff to bleed, and ultimately left scars on Plaintiff's wrists and ankles that can still be seen today. Nurses at the hospital told Defendant Washburn that the

restraints were causing Plaintiff injury, and applied gauze and bandages to ameliorate the damage

that the restraints were causing to Plaintiff's wrists and ankles. There was no legitimate safety

and security concern that would justify such deliberate and unnecessary infliction of physical

damage to Plaintiff's body, and the mental and emotional distress that this caused.

### c.    Defendant Is Not Entitled To Qualified Immunity.

Defendant asserts in the Motion, Page 11, that he is entitled to qualified immunity

because, "He applied the restraints to plaintiff in compliance with ODOC policy and in

consultation with both Master Control and medical staff treating plaintiff..." Applying the

restraints in such a fashion that they caused bleeding and permanent scarring is not in compliance

with O.D.O.C. policy. Defendant cannot cite any O.D.O.C. policy that justifies such an excessive

and wanton infliction of damage. There is nothing in the record of this case that substantiates that

Defendant Washburn consulted with Master Control at T.R.C.I. at all, much less that he

specifically advised Master Control that the restraints were causing Plaintiff to bleed and asked

whether he should continue without changing the conditions of the restraint that was causing the

injury. And medical staff advised Defendant Washburn that the restraints were causing injury to

Plaintiff and asked that he do something to change them so that they would not injure Plaintiff

any further, which Defendant Washburn ignored. (See Exhibit C – Inmate Communication

Forms addressed to Defendant Gruenwald.)

### C.    Defendants are not entitled to summary judgment against Claim III.

#### 1.    Background Facts.

When Plaintiff arrived at T.R.C.I. on February 13, 2019 he was unable to walk, even

short distances. Plaintiff was given a wheelchair upon arrival at T.R.C.I. on February 13, 2019.

The wheelchair was taken from Plaintiff on order of Shannon Johnston, T.R.C.I. Health Services

Manager. Security staff in the housing unit to which Plaintiff was assigned called Health Services

staff to inform them that Plaintiff was unable to walk to the area where food was served. Health

Services staff wrote in Plaintiff's medical file that Plaintiff had gone on "hunger strike." There

was no hunger strike. Plaintiff would have eaten had he been able to walk to the area where the

food was served. Nurse Practitioner Gruenwald acknowledged that Plaintiff had needed

assistance with getting a food tray when she ordered that an orderly be assigned to help Plaintiff

with meal trays, as Defendants noted in their Motion, Page 12. Had Plaintiff been able to avail

himself of the meal trays without assistance, there would have been no need for Defendant

Gruenwald to assign a orderly to assist him with meal trays.

Defendants attempt to minimize the difficulty Plaintiff faced in walking to the area where

food was served by stating in their Motion, Page 12: "Plaintiff would have had to have walked

just 50-75 yards to get a meal tray." If it were true that Plaintiff was conducting a "hunger strike,"

what difference would it have made what the distance was to the area where the food was

served? This is another tacit admission that Plaintiff was in fact not malingering, or conducting a

"hunger strike." Plaintiff was unable to walk at all, regardless of the distance.

>    2.    **Legal Argument.**

>        a.    **Defendants' Actions Deliberate Indifference.**

Defendants knew that Plaintiff was unable to walk, as they acknowledged by assigning

him a wheelchair upon his arrival at T.R.C.I.. Being unable to walk after a major surgery to

Plaintiff's back is unquestionably a serious medical need. Forcing Plaintiff to use a cane to walk

before his back was sufficiently healed from the surgery to allow him to walk posed a threat of

further significant injury. This is behavior that falls within the standard for deliberate

indifference to a serious medical need that constitutes cruel and unusual punishment in violation

of the 8th Amendment according to the precedent-setting case law cited by Defendants in their

Motion, Page 13. Defendants also point to case law that establishes that the potential further

harm must be more than *de minimis*. Plaintiff could well have fallen and injured his back such that the damage to his spinal cord would result in permanent paralysis and inability to function properly. This is certainly more than *de minimis* injury.

Defendants make the statement in their Motion, Page 14, that, "...plaintiff cannot establish an Eighth Amendment claim arising out of his hunger strike..." Plaintiff has made no claim that there was an Eighth Amendment violation resulting from a "hunger strike." Even presuming there were a "hunger strike," why would Plaintiff make a claim that a violation arose from it? Defendants' statement is patently absurd.

### b.    Defendants Violated ADA.

Defendants state that this Court should dismiss Plaintiff's claim under the Americans With Disabilities Act (42 U.S.C. §§ 12101 to 12213) because they assert that, "(i) plaintiff has not stated a claim under Title II of the ADA; and (ii) there is no individual liability under Title II of the ADA."

However, with respect to (i) Plaintiff has stated sufficient prima facie claims in Claims III, IV, and V of his Complaint under the ADA to invoke the jurisdiction of this Court over those claims and require this Court to give those Claims due consideration.

With respect to (ii), Plaintiff did not make the Claims under the ADA against any individual. Plaintiff named The Oregon Department of Corrections (O.D.O.C.) as a Defendant, to be sued in its official capacity as the employer of each of the other named Defendants, and as the entity ultimately responsible for promulgating the rules that the Defendants either followed or violated in their discriminatory actions against Plaintiff. It was this Court's decision to remove the O.D.O.C. from the list of Defendants that would be named in this action.

### i.    Claim Under Title II Of The ADA.

Citing *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002), Defendants list four criteria

that must be met to succeed in an ADA claim. (Motion, Page 14.) Plaintiff will demonstrate that

he fits all four of these criteria.

One, Plaintiff is an individual with a disability. 42 U.S.C. § 12102. Defines, "As used in

this chapter:

> "(1) Disability
> > "The term "disability" means, with respect to an individual-
> > "(A) a physical or mental impairment that substantially limits one or more
> major life activities of such individual;
> > "(B) a record of such an impairment; or
> > "(C) being regarded as having such an impairment (as described in
> paragraph (3))."

Plaintiff stated in Claim V that he suffers both physical and mental disabilities (Complaint, Pages

6, 7). Plaintiff's mental disability is substantiated by the discovery provided by Defendants, Pages

0053, 0054, "DOC Offender Profile System, Housing/Outcount History." An examination of that

record shows that from 07/31/2003 through 10/24/2003, 06/28/2004 through 07/22/2004,

07/15/2005 through 08/02/2005, and 09/03/2009 through 11/18/2009 Plaintiff was housed in the

SMU (Special Management Unit) at SRCI (Snake River Correctional Institution), a housing unit

where severely mentally ill people are segregated from the general inmate population because

they are unable to interact socially with others. From 11/08/2014 through 07/19/2017,

04/09/2018 through 06/28/2018, and 10/30/2018 Plaintiff was housed in the MH (Mental Health)

unit at TRCI, the housing unit for the severely mentally ill that is the equivalent of the SMU at

SRCI. From 11/07/1018 through 01/15/2019 Plaintiff was housed in ICH (Intermediate Care

Housing) at OSP, a housing unit for inmates who are in transition between housing units like

SMU and MH and general population. Plaintiff is currently housed in general population at OSP

because he is able to interact with others without major conflict or overwhelming anxiety, while

he continues to be under the care of Behavioral Health Services, the section within the O.D.O.C.

responsible for the care of mentally ill AIC's.

For purposes of clarifying the definition of "disability" in paragraph (1) of § 12102,

paragraph (2) defines,

> "Major life activities
>
>       "(A) In general
>
> "For purposes of paragraph (1), major life activities include, but are not
> limited to, caring for oneself, performing manual tasks, seeing, hearing, eating,
> sleeping, walking, standing, lifting, bending, speaking, breathing, learning,
> reading, concentrating, thinking, communicating, and working.
>
>       "(B) Major bodily functions
>
> "For purposes of paragraph (1), a major life activity also includes the
> operation of a major bodily function, including but not limited to, functions of the
> immune system, normal cell growth, digestive, bowel, bladder, neurological,
> brain, respiratory, circulatory, endocrine, and reproductive functions."

It is well documented in the records kept by the mental health housing units in which Plaintiff

has been housed, and by the BHS staff who currently oversee Plaintiff that his mental impairment

severely limits many of the life activities listed in § 12102, paragraph (2).

Two, Plaintiff is qualified to participate in or receive the benefit of a public entity's

services, programs, or activities. O.D.O.C. is a public entity. Plaintiff has from his first

introduction into the O.D.O.C. until the present participated in and benefited from services,

programs, and activities within the O.D.O.C. that are specifically targeted to treating the severely

mentally ill.

Three, Plaintiff has been discriminated against by O.D.O.C.. In Claim III of his

Complaint, Plaintiff alleges that he was denied the use of a wheelchair and deprived of food

because Defendants were retaliating against him on the basis of his mental disabilities. By the

time of the incidents that are the subject of Claim III, Plaintiff had been under the care of BHS at

TRCI since November of 2014, such that Defendants knew that he was a severely mentally ill

person who had been designated as a problem by BHS staff and had been housed in both

administrative and disciplinary segregation due to conflicts with staff and AIC's.

Four, it was because of Plaintiff's mental disability that he was deprived of the services, programs and activities explained in Claims III, IV, and V. Plaintiff alleges that the actions of Defendants outlined in Claim III were in reaction to that history outlined in the previous paragraph, that Defendants specifically targeted him for retaliation because of his mental health behavioral problems. Similarly, in Claim IV Plaintiff alleges that the actions of Defendant John Doe in the Receiving unit of EOCI were at least in part because of Plaintiff's known mental health behavioral issues. Likewise in Claim V with respect to Plaintiff's removal from the ROC dog training program. In each of the Claims wherein Plaintiff has cited the ADA, Defendants acted in a discriminatory manner because of his mental health behavioral problems, which result in Plaintiff being a difficult personality to interact with, which is why he has been housed in various housing units within O.D.O.C. that are specifically designed to segregate problem mentally ill AIC's from the general population. Staff members who are trained for working in those housing units are trained to interact with mentally disabled AIC's such as Plaintiff. Defendants have displayed a failure to interact effectively with Plaintiff.

That Plaintiff suffers from physical disabilities is clear from his Claims, from the record, and from Defendants' own declarations. It is undisputed that Plaintiff underwent major surgery to his back that resulted in his being unable to walk for a period of time, and that to this day he must use a cane to walk. This physical disability was used against him when Defendants refused to provide him with a wheelchair to get to the area where food was served, resulting in his being starved for several days. Defendants have made repeated tacit admissions that Plaintiff is physically disabled by providing him with a wheelchair on other occasions when it served their interests to have him move from one place to another, and in prescribing a cane on a permanent basis with which to walk. There is no other reason that Defendants can offer to explain why Plaintiff was denied a wheelchair for those days when he was unable to carry himself to the area

where the food was being served than that Defendants were trying to use his physical disability to manipulate him into acting in a way that they could use to claim that he was malingering, and when he did not react in the way they hoped – which would have been to get up and walk to the area where food was being served, which he could not do because he actually could not walk – they capitulated and provided a wheelchair and the assistance of an orderly.

### ii.    No Individual Liability Under Title II Of The ADA.

Plaintiff concedes that individuals may not be sued under 42 U.S.C. § 1983 for a violation of Title II of the ADA. Plaintiff asks that this Court allow Plaintiff to sever this claim under Title II of the ADA, to amend his Complaint to remove Title II of the ADA from the language of any of the claims included in the Complaint, and for leave to file the claim against the O.D.O.C. under 28 USC § 2254 even though it would normally be considered defaulted due to the statute of limitations, given that Plaintiff would have been within the statute of limitations for filing under 28 USC § 2254 had he been aware that he was required to file this claim under that statute rather than under 42 U.S.C. § 1983.

### c.    Defendants Not Entitled To Qualified Immunity.

Defendants knew or should have known that they were violating Plaintiff's Constitutional rights when they took away his wheelchair immediately after his having undergone major surgery to his back, and refusing to allow anyone to bring a food tray to him when he was unable to walk to the area where food was being served. Defendants are trained as employees of O.D.O.C. to understand that deliberate indifference to an AIC's serious medical need, and depriving him of food for several days constitutes cruel and unusual punishment of Constitutional magnitude. To conclude otherwise would be tantamount to concluding that Plaintiff should be expected to rely on a miracle of healing to his back and to be fed by divine intervention.

**D.**    **Defendants E.O.C.I. Intake Officer "John Doe," E.O.C.I. Superintendent Sue Washburn, E.O.C.I. Assistant Superintendent D. Pedro, and E.O.C.I. PREA Compliance Officer Stewart are not entitled to summary judgment against Claim IV.**

**1.**    **Background Facts.**

Upon arrival at E.O.C.I. on January 15, 2019 Plaintiff was taken to the Intake Unit of the facility. The Intake Officer – who remains a "John Doe" to Plaintiff due to "John Doe" and all other O.D.O.C. staff involved in this incident refusing to reveal his identity to Plaintiff – subjected Plaintiff to a strip search. Upon examining Plaintiff's body, the Intake Officer made comments about the size of Plaintiff's penis, saying that for a faggot he had a small penis (using vulgar terms for it rather than "penis"), that Plaintiff should have it removed, that he would cut it off for Plaintiff, or have someone bite it off, and that Plaintiff should play with it. After some time of this, the Intake Officer ordered Plaintiff into his office, where he threatened to put him in segregation or to beat him if he did not do exactly as ordered.

Plaintiff called the PREA hotline and reported the incident to them. In response PREA Compliance Officer Stewart interviewed Plaintiff. Plaintiff sent AIC Communications ("kites") to both Superintendent Washburn and Assistant Superintendent Pedro. To date nothing has been done for Plaintiff with regard to this incident.

**2.**    **Legal Argument.**

**a.**    **Defendants Not Under Sovereign Immunity.**

In their Motion, Page 17, Defendants state that, "For the same reasons discussed in Part II.B.2.a above, under ORS 30.265(3), Superintendent Washburn and Assistant Superintendent Pedro must be dismissed from plaintiff's state law claim and the State of Oregon substituted in their place. Upon substitution, plaintiff's state law claim is barred by sovereign immunity." As in Part II.B.2.a above of these Objections, Plaintiff has made no State law claim that would allow

for substitution of the State of Oregon pursuant to ORS 30.265(3). Plaintiff clearly states in his Complaint, Page 5, "This is a civil rights action filed by Steven Jeremy Freeman, a state prisoner for damages and injunctive relief under 42 U.S.C. § 1983, the Eighth Amendment cruel and unusual punishment, sexual harassment, outrageous conduct, intentional infliction of emotional distress, the Americans with disabilities act, Discrimination act." There is no claim under any state law. Counsel for Defendants, experienced in law, may interpret the term "intentional infliction of emotional distress" as a state law tort, but Plaintiff has no legal education whatever, and has no intention of making any sort of state law claim. Plaintiff's intention is that his claims be evaluated in terms of the rights afforded to him under the Constitution of the United States of America, and no other authority is invoked for his claims. Plaintiff is aware of no law that entitles Defendants to sovereign immunity from insuring in their official capacity as employees of the O.D.O.C. that their actions do not infringe on the Constitutional rights of the prisoners it is their responsibility to supervise.

> **b.    Defendants Violated ADA.**

For the same reasons discussed above in Part II.C.2.b, Defendants did in fact violate the ADA, and as in Part II.C.2.b(i) and (ii) Plaintiff prays this Court order that he be given leave to file the claim against the O.D.O.C. under 28 USC § 2254.

> **c.    Defendants Did Participate In The Violation Of Plaintiff's Constitutional Rights In A Manner That Incurs Liability Under § 1983.**

Plaintiff made requests via kites to both Defendants Superintendent Washburn and Assistant Superintendent Pedro to investigate and correct the problem with Defendant "John Doe" Intake Officer, and to provide Plaintiff with the name of this "John Doe." Defendants Washburn and Pedro have the responsibility and the authority in their official capacities as administrators of E.O.C.I. to supervise and discipline the staff under their authority. They took no

action whatever to investigate the actions of Defendant Intake Officer "John Doe," and furthermore obstructed Plaintiff's attempts to discover the identity of Defendant "John Doe," thereby assisting in covering for his abusive behavior. This is not a *respondeat superior* argument. Rather, Plaintiff alleges that Defendants Washburn and Pedro each took or failed to take actions that they were required to take in their official capacities to protect and preserve Plaintiff's rights under the US Constitution.

### d.    Defendants Not Entitled To Qualified Immunity.

Defendants knew or should have known that they were violating Plaintiff's Constitutional rights when they did nothing to address the requests made to them by Plaintiff to investigate the incident that is the subject of this Claim and discipline Defendant "John Doe" for his actions, and further have continued to obstruct Plaintiff's attempts to find a remedy to the problem by concealing the identity of Defendant "John Doe" from Plaintiff. They were in fact involved in this matter by doing nothing to correct the problem or to insure that Plaintiff's Constitutional rights were preserved and protected.

### e.    Defendant E.O.C.I. Intake Officer "John Doe" Has Not Moved For Summary Judgment.

Defendants' Motion For Summary Judgment does not state any argument in favor of granting summary judgment on behalf of Defendant Intake Officer "John Doe." This Court should not grant summary judgment where a Defendant has not moved for it, absent any compelling reason for it or any argument in favor of it.

### D.    Defendants are not entitled to summary judgment against Claim V.

#### 1.    Background Facts.

Plaintiff was a participant in the "Rehabilitating Offenders and Canines" (ROC) program from July 21, 2017, through June 28, 2018. Throughout this time Plaintiff was commended for

his exemplary performance by O.D.O.C. staff supervising the program. On June 28, 2018

Plaintiff was placed in disciplinary segregation for an alleged rule violation unrelated to his

participation in the ROC program. On July 11, 2018, after a thorough investigation and three

separate hearings, Plaintiff was completely exonerated of any wrongdoing in the disciplinary

action and released from segregation. Upon his release from segregation Plaintiff was told that he

would not be allowed to participate in the ROC program because he had missed 13 days of work.

The time that Plaintiff did not attend the ROC program was by no fault of his own. He had not

committed any rule violation, but was placed in segregation because of an accusation for which

he was exonerated in a formal disciplinary hearing. Defendants stated no other reason for not

allowing Plaintiff to return to participation in the ROC program, besides the fact that he had not

attended during the period he was segregated. Plaintiff requested to Defendant Accounting

Supervisor Dawn Wagner, the supervisor of the ROC program, to be returned to participation in

the ROC program, but Defendant Wagner refused, solely on the basis that Plaintiff had not

attended the program during the 13 days he was segregated. Plaintiff requested to Defendant

Martinez, the Correctional Counselor assigned to his case, to be returned to participation in the

ROC program, but Defendant denied his request solely on the basis of his failure to attend the

program during the 13 days he was segregated. Likewise with T.R.C.I. Superintendent Troy

Bowser.

    **2.**    **Legal Argument.**

    **a.**    **Defendants Not Under Sovereign Immunity.**

In their Motion, Page 19, Defendants state that, "For the same reasons discussed in Part

II.B.2.a above, under ORS 30.265(3), Ms. Wagner, Counselor Martinez, and Superintendent

Bowser must be dismissed from plaintiff's state law claim and the State of Oregon substituted in

their place. Upon substitution, plaintiff's state law claim is barred by sovereign immunity." As in

Part II.B.2.a above of these Objections, Plaintiff has made no State law claim that would allow

for substitution of the State of Oregon pursuant to ORS 30.265(3). Plaintiff clearly states in his

Complaint, Page 6, "This is a civil rights action filed by Steven Jeremy Freeman, a state prisoner

for damages and injunctive relief under 42 U.S.C. § 1983, the Fourteenth Amendment under

religion, sexual orientation, for physical, & mental disability, intentional infliction of emotional

distress." There is no claim under any state law. Counsel for Defendants, experienced in law,

may interpret the term "intentional infliction of emotional distress" as a state law tort, but

Plaintiff has no legal education whatever, and has no intention of making any sort of state law

claim. Plaintiff's intention is that his claims be evaluated in terms of the rights afforded to him

under the Constitution of the United States of America, and no other authority is invoked for his

claims. Plaintiff is aware of no law that entitles Defendants to sovereign immunity from insuring

in their official capacity as employees of the O.D.O.C. that their actions do not infringe on the

Constitutional rights of the prisoners it is their responsibility to supervise.

### b.    Defendants Violated ADA.

For the same reasons discussed above in Part II.C.2.b, Defendants did in fact violate the

ADA, and as in Part II.C.2.b(i) and (ii) Plaintiff prays this Court order that he be given leave to

file the claim against the ODOC under 28 USC § 2254.

### c.    Defendants Did Participate In The Violation Of Plaintiff's Constitutional Rights In A Manner That Incurs Liability Under § 1983.

Plaintiff made requests via kites to Defendants to be returned to participation in the ROC

program after his release from segregation upon being exonerated of the accusation made against

him. Defendants Wagner and Martinez have the responsibility and the authority in their official

capacities as employees of T.R.C.I. to supervise AIC's under their authority and assign them to

programming appropriate to their rehabilitative objectives. Defendant Bowser has the

responsibility and authority in his position as Superintendent of T.R.C.I. to insure that the

O.D.O.C. employees under his supervision are performing the functions that they are empoyed to

fulfill, particularly when the AIC's that are under the supervision of said Defendants specifically

request that Defendant Bowser investigate and take appropriate action to insure that said

Defendants are doing as required by the mandates of their employ. (See Exhibit D – Inmate

Communication Forms addressed to Defendant Bowser, and response memos from Defendant

Bowser.) This is not a *respondeat superior* argument. Rather, Plaintiff alleges that Defendants

Wagner and Martinez each took or failed to take actions that they were required to take in their

official capacities to protect and preserve Plaintiff's rights under the US Constitution, and when

Plaintiff requested of Defendant Bowser that he take action to correct the failure of Defendants

Wagner and Martinez, he failed to take appropriate action.

### d. Defendants Violated Fourteenth Amendment.

Defendants have interpreted Plaintiff's reference in Claim V of the Complaint to the

Fourteenth Amendment as an equal protection claim. However, Plaintiff invokes the Fourteenth

Amendment as a claim that his right to due process has been denied him by Defendants. Plaintiff

was removed from participation in the ROC program without any process whatever. He was

simply told that he would not be allowed to participate anymore because he had missed 13 days

of work. There was no misconduct report generated, no program failure report generated, in fact

no report whatever. Plaintiff was not afforded any administrative process to appeal the decision

of removing him from the ROC program. His removal was entirely autocratic and unilateral. The

actions of Defendants in this matter are so opaque, Plaintiff has no way of knowing even who

ultimately made the decision to remove him from the ROC program.

### e.    Defendants Not Entitled To Qualified Immunity.

Defendant Wagner knew or should have known that she was violating Plaintiff's

Constitutional rights when she simply removed him from the ROC program without following

the procedure established. The process for removing an AIC from a program is established in

Oregon Administrative Rule (OAR) 291-077-0033. When an O.D.O.C. employee who is

supervising AIC's participating in a program find that the AIC's performance is unsatisfactory,

the OAR provides:

> (2) Program Fail: The inmate assignment supervisor or counselor, in his/her sole discretion, with reasonable cause based upon an inmate's poor performance and non-compliance with prescribed programming may fail an inmate from any qualifying program. Poor performance and non-compliance include the following behaviors: refusal to participate, non-attendance, poor performance quality, poor performance effort, poor interpersonal communications with staff and fellow inmates, violations of prohibited inmate conduct, poor self-improvement effort, and inability to follow directions or to ensure the orderly continued operation of the program.
>> (a) When a program failure is submitted, it is the supervisor's responsibility to complete an Inmate Performance Report (CD 118b).
>> (b) One copy will be given directly to the inmate, one copy attached to the daily attendance roster, and remaining copies distributed in accordance with institution-specific procedures.

The AIC then has the option of appealing the Program Fail using a process also

 established by the OAR:

> (3) For purposes of this rule, inmates who dispute a program fail may use the inmate grievance system as described in the rule on Inmate Grievance Review System (OAR 291-109).

However, since Defendant Wagner did not follow the procedure established in OAR 291-

077-0033(2), Plaintiff was unable to use the procedure established in OAR 291-077-

0033(3) to afford him an appeal of her decision. There can be no qualified immunity for a

person acting in their official capacity as an employee of the O.D.O.C. who fails to follow

the procedures established in the OAR's that govern their expected behavior.

Defendants Martinez and Bowser claim that they are entitled to qualified immunity

because they "were not involved in the matter at all." (Motion, Page 20.) However, they were in

fact involved in this matter by doing nothing to correct the problem or to insure that Plaintiff's

Constitutional rights were preserved and protected when Plaintiff requested that they review the

decision of Defendant Wagner in removing Plaintiff from the ROC program. They knew, or

should have known that Defendant Wagner was required to follow the procedure established in

OAR 291-077-0033 when she removed Plaintiff from the ROC program. When Plaintiff

requested that they do something to correct the problem, they were each responsible to follow the

procedures established for their particular assignments as O.D.O.C. employees for addressing the

concerns of AIC's under their supervision.

Defendant Counselor Martinez's responsibility toward Plaintiff is governed by 291-207-

0025(2), which states, in part:

> The inmate's primary institution counselor is responsible to develop, document
> and monitor the inmate's needs and corresponding resources to address those
> needs, along with timelines including forecasting custody classification changes
> and subsequent facility transfers for provisions of interventions and housing
> management as outlined in the policy on Correctional Case Management (90.1.3).

The policy referenced, in turn stipulates: "Case management is the shared responsibility

of all Department of Corrections employees..." (DOC Policy 90.1.3, III, A., 2.) In other

words, the responsibility of decision-making about Plaintiff's job assignment was equally

shared between all three Defendants named in this Claim. When Plaintiff requested that

Defendant Counselor Martinez investigate and take action with respect to the decision to

remove him from the ROC program, it was Defendant Martinez's responsibility to

respond accordingly, as required by his employment by O.D.O.C..

Defendant Superintendent Bowser is the Functional Unit Manager of T.R.C.I., and

his duties are outlined in the OARs. For example, OAR 291-124-0010:

> (5) Functional Unit Manager: Any person within the Department of Corrections
> who reports to the Director, Deputy Director, an Assistant Director or an
> administrator and has responsibility for the delivery of services or coordination of

programs. In a correctional setting the superintendent is the functional unit manager.

Again, Plaintiff emphasizes that this is not a *respondeat superior* argument. Defendant Bowser is personally responsible for failing to carry out his duty to insure to Plaintiff "the delivery of services or coordination of programs" when Plaintiff specifically requested to him individually to do so.

### Conslusion

For the reasons stated above, Defendants are not entitled to summary judgment, as there are in fact matters of material fact that are in dispute that should be addressed by this Court before any judgment is made as to the merits of Plaintiff's claims. Defendants' Motion For Summary Judgment should be denied.

Dated this ___8___ day of _A‑ugust_____, 2022.

Respectfully Submitted,

Steven Jeremy Freeman
SID#: 14561263
Oregon State Penitentiary
2605 State Street
Salem, OR 97310

## CERTIFICATE OF SERVICE

**CASE NAME: STEVEN JEREMY FREEMAN v. SCHWARTZ ET AL**

**CASE NUMBER: 2:20-cv-00602-CL**

COMES NOW, the Plaintiff, Steven Jeremy Freeman, and certifies the following:

That I am incarcerated by the Oregon Department of Corrections at the Oregon State Penitentiary in Salem, Oregon.

That on the _8_ day of _August_____, 2022, I personally placed in the Penitentiary's mailing service A TRUE COPY of the following:

1) Plaintiff's Objections to Defendants' Motion for Summary Judgment.

I placed the above in a securely enclosed, postage prepaid envelope, to the person named at the place addressed below:

Ellen F. Rosenblum
Attorney General
Shannon M. Vincent
Senior Assistant Attorney General
1162 Court Street NE
Salem, OR 97301-4096

Steven Jeremy Freeman, Pro Se
S.I.D. No.: 14561263
Oregon State Penitentiary
2605 State Street
Salem, OR 97310